UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| BRIAN E. SCALF, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 3:08-CV-316 |
| | ) | (PHILLIPS/GUYTON) |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

This matter was referred to the undersigned pursuant to 28 U.S.C. § 636(b), Rule 72(b) of the Federal Rules of Civil Procedure, and the Rules of this Court for a report and recommendation regarding the disposition by the District Court of the plaintiff's Motion For Summary Judgment [Doc. 10], and the defendant's Motion For Summary Judgment [Doc. 17]. Plaintiff Brian E. Scalf seeks judicial review of the decision of the Administrative Law Judge ("ALJ"), the final decision of the defendant Commissioner.

## BACKGROUND

Plaintiff was 39 years of age when the ALJ issued his decision (Tr. 57, 23). He is a high school graduate with most recent work experience as a truck driver and delivery person (1997-2003) and as a lamination tech for a boat manufacturer (1995-1997). He alleges that he has been disabled since January 28, 2003, based on the following: "Bipolar, manic depression, hypertension, liver disease, alcoholism, obesity" (Tr. 57-59, 61).

## MEDICAL RECORD AND TESTIMONY EVIDENCE

The relevant medical record and testimony evidence is summarized as follows:

The ALJ conducted two hearings in this case, the initial hearing on February 21, 2006, and a supplemental hearing, primarily to address mental impairment issues, on August 15, 2006. At the hearing in February 2006, plaintiff testified that he last consumed alcohol about a week or two previously, but that he no longer drank daily (Tr. 579). He said he was in treatment for his alcohol abuse. Plaintiff also testified that he could not work because he had sleep difficulties: he could be up for several days in a row and then would sleep for several days (Tr. 581). He got very nervous and stressed out and then did stupid things. Plaintiff testified that Melissa Moody, his girlfriend, filled out the forms related to his application, as he could not remember such things as when he was hospitalized or even what medications he took (Tr. 582).

Plaintiff testified that he weighed about 220 pounds when he stopped working in January 2003, and that he currently weighed more than 350 pounds (Tr. 577, 583). In October 2003, he had reported his weight as 314 and his height at 6'1" (Tr. 60).

Dr. LeBuffe was his psychiatrist whom he saw one to three times a month (Tr. 583-84). As part of the program in which he was enrolled, he was required to see a caseworker/counselor a minimum of eight times a month, at which time he was tested for alcohol consumption (Tr. 583). Dr. LeBuffe told plaintiff that his drinking was a form of self-medication for his bipolar disease. He now took medication, but that medication was still being adjusted (Tr. 584). His current medications were helping him more than past medications (Tr. 484-85). He felt worthless because he was not supporting his children (Tr. 485). In the past, he had had thoughts of

2

suicide and made several attempts. He said he had a lot of trouble concentrating (Tr. 587). He also testified that he did not have much desire to do anything, and Ms. Moody put out his medication for him to take (Tr. 587-88). He could take a shower, dress himself, and make a sandwich (Tr. 588).

Ms. Moody testified at the February, 2006 hearing, that she had lived with plaintiff for about eight years (Tr. 589-90). He had been on many medications over the past three years, including medications to stop visual and auditory hallucinations and to help him sleep (Tr. 590). She said that the plaintiff stayed up for days at a time and slept for days at a time. He also took two different medications for hypertension and medication for anxiety. She said that Dr. LeBuffe was still trying to adjust his medications, especially to help him sleep (Tr. 590-91).

The final witness at the February 2006 hearing was Katherine Reynolds Bradford, a vocational expert. The ALJ asked Bradford to assume that the hypothetical plaintiff had the residual functional capacity for a range of medium work, but also some psychological or emotional problems that would preclude him from any work other than simple, repetitive, non-detailed tasks, with only occasional co-worker or public contact, and with the need for strong supervision and a mostly unchanging workplace. Bradford testified that there were jobs in the state and national economy (Tr. 592-593). However, she testified that if the hypothetical were changed to include the fact that the plaintiff might miss work for three days at a time due to sleeping all day, then there would be no competitive employment opportunities (Tr. 595-596).

At the conclusion of the February 2006 hearing, the ALJ announced that he wanted a medical expert to opine about the issue of substance abuse. He said he would send plaintiff's psychological and psychiatric records for review.

3

Those interrogatories from the ALJ were sent to Thomas Schact, Psy.D., a board-certified psychologist. In May, 2006, Schact prepared a response (Tr. 546-52; 604). After summarizing the medical records, he stated that plaintiff's primary impairment was substance abuse, and that the record did not show the presence of a persistent mood disorder that was not substance induced (Tr. 548). Schact opined that even if it were established that plaintiff had a bipolar disorder separate from the substance disorder, the record, including a note from Dr. Sexton's office and Dr. Jethanandani's May 17, 2004 note, showed a positive response to treatment (Tr. 548). Prior IQ testing indicated a borderline IQ (Tr. 549). Academic testing showed reading at a high school level and a learning disability in mathematics. According to Schact, this evidence was not, however, consistent with his apparent ability to obtain a commercial driver's license (CDL) and hazardous materials certification. Treating physicians had not viewed him as intellectually impaired. Plaintiff's condition related to Listing 12.09 for substance addiction, but while his crises were severe and multiple, they did not meet the 12-month duration requirement.

Dr. Schact also completed a Medical Source Statement of Ability To Do Work-Related Activities (Mental) (Tr.550-52). Dr. Schact concluded that plaintiff had no limitations regarding the ability to understand, remember, and carry out short, simple instructions; had slight limitations regarding the ability to understand, remember, and carry out detailed instructions; and had slight limitations in his ability to make judgments on simple workrelated decisions (Tr. 550). He based these conclusions on plaintiff's work history and mental status observations when he was sober and his limited education (Tr. 550). Dr. Schact indicated that plaintiff had slight limitations in the ability to interact appropriately with the public; interact appropriately with supervisors;

4

interact appropriately with co-workers; respond appropriately to work pressures in a usual work setting; and respond appropriately to changes in a routine work setting (Tr. 551). He noted that plaintiff's history of relationship difficulties suggested that he might be best suited to working with objects and mostly on his own. Dr. Schact stated that the ratings assumed sobriety.

At the supplemental hearing on August 15, 2006, Dr. Schact testified as a neutral medical expert (Tr. 604). Dr. Schact testified that, after completing the interrogatories sent to him by the ALJ, he destroyed the records that had been sent to him (Tr. 605). He subsequently received a significantly larger medical file, which included Dr. Francis LeBuffe's records, which were not part of the earlier record (Tr. 607). Dr. Schact testified that, with the additional records, he modified his assessment of plaintiff's mental functioning, because it answered some questions about how he functioned between hospitalizations (Tr. 608). However, there were still some uncertainties (Tr. 609-10).

He noted that Dr. LeBuffe had described significant obstructive sleep apnea that appeared not to have been followed up on, and this condition can produce cognitive deficits (Tr. 610-11). In addition, Dr. LeBuffe's records according to Dr. Schact, indicated that Mr. Scalf sometimes did not take his medications or used them infrequently (Tr. 611-12).

Dr. Schact acknowledged that during the April 2003 hospitalization, plaintiff was diagnosed with bipolar disorder, as well as a substance abuse problem, and that medication was prescribed for the bipolar condition.

5

Dr. Schact stated that he believed that plaintiff was addicted to alcohol (Tr. 618-19).

In September 2006, Dr. Schact completed another Medical Source Statement Of Ability To Do Work-Related Activities (Mental) (Tr. 556-58). On this form, he indicated that plaintiff had no limitations on understanding and remembering short, simple instructions or carrying out short, simple instructions; slight limitations making judgments on simple work related matters; and moderate limitations understanding and remembering detailed instructions and carrying out detailed instructions (Tr. 556). He stated that he based these conclusions on the plaintiff's borderline IQ testing. He stated that impairment in this area could be worse if plaintiff's sleep apnea was resistant to treatment, as stated by Dr. LeBuffe on May 12, 2005 (Tr. 556).

With regard to plaintiff's ability to perform the social functions listed above, Dr. Schact gave alternate findings (Tr. 557). He assessed that social functions were only slightly limited if the GAF scores, ranging from 60 to 80, and Dr. LeBuffe's notes, ending on December 6, 2005, which claimed that plaintiff was "doing well," were accepted. On the other hand, these functions were markedly limited if Dr. LeBuffe's notes from 2006 were accepted. In this regard, Dr. Schact stated that, to accept the more recent findings of Dr. LeBuffe, one had to assume that plaintiff's condition deteriorated markedly <u>after</u> he achieved sobriety (Emphasis by Dr. Schact). According to Dr. Schact, this was an unusual clinical course, as patients generally improve when sober. In addition, he pointed out that the alleged deterioration occurred <u>after</u> plaintiff discontinued use of an anti-alcohol medication (Compral) in August 2005, (emphasis by Dr. Schact) (Tr. 557).

In July 2005, Dr. LeBuffe, also a board certified psychiatrist, completed a Medical Source Statement of Ability To Do Work-Related Activities (Mental) (Tr. 524-25). He indicated

6

that plaintiff had marked limitations in the ability to understand and remember short, simple instructions and carry out short, simple instructions and extreme limitations in understanding, remembering and carrying out detailed instructions; and extreme limitations in the ability to make judgments in simple work-related decisions (Tr. 524). He noted that plaintiff was unable to remember to take his medication without the assistance of his girlfriend. He stated that, due to worry, he was unable to concentrate on a task well enough to follow through and complete it. Also, he stated that plaintiff had marked limitations in the ability to interact appropriately with the public and with supervisors, as well as extreme limitations in the ability to interact appropriately with coworkers; respond appropriately to work pressures in a usual work setting; and respond appropriately to changes in a routine work setting. He added that in a prior work situation, plaintiff was unable to interact appropriately with co-workers or take instructions from a supervisor (Tr. 525).

At the supplemental hearing on August 15, 2006, Dr. LeBuffe testified that he first treated plaintiff in February 2004 at St. Mary's Hospital and treated him subsequently (Tr. 629-30). With regard to the medical source statement from July 2005 (Tr. 524-25), Dr. LeBuffe testified that he signed this form in July 2005, but that he thinks the case manager at "CCC" filled out the handwritten portion of the form (Tr. 630). Dr. LeBuffe stated that he believed he checked the boxes on the form. Dr. LeBuffe stated that plaintiff has concurring disorders of bipolar disorder and chemical dependency conditions, and his answers on the form reflected that fact (Tr. 631). Dr. LeBuffe testified that during periods when plaintiff was sober and abstinent, there was abundant evidence of a continuous and severe mood disorder that reached the levels of marked or extreme

7

limitations, even without the use of alcohol. It rapidly cycled from mania to depression and back to mania (Tr. 631).

According to Dr. LeBuffe, plaintiff's sleep apnea made his difficulties more pronounced (Tr. 632). However, his primary sleep problem was that he did not sleep when he was in a manic phase and he slept excessively when he was depressed. Recently the use of sleep medications had enabled plaintiff to sleep four to five hours even when he was in a manic phase, but he still had several days of very minimal sleep and then several days of very excessive sleep (Tr. 632).

Dr. LeBuffe testified that when he filled out the form, plaintiff was not drinking, and he did not include limitations from drinking in his evaluation (Tr. 632-33). The medications plaintiff currently used caused somnolence and some slowing of mental functions (Tr. 633). The doctor testified that, in general, alcohol could cause depression, but not mania. He believed that plaintiff's limitations were from bipolar disorder, not alcohol abuse (Tr. 634).

Two other consultive examinations were performed in this case, during 2004. On March 11, 2004, Alice Garland, M.S. performed a consultive examination (Tr. 437-441). Ms. Garland also diagnosed bipolar disorder and assessed a GAF score of 50-55, with borderline intellectual functions (Tr. 440). Ms. Garland concluded that the plaintiff appeared "limited" in the ability to do "very complex work," with persistence and concentration, and ability to get along with people, moderately limited. She said that plaintiff's ability to work with the public and to adapt appears to be severely limited (Tr. 441).

8

Jodi Castellani, Ph.D., performed a consultive examination on September 30, 2004 (Tr. 495-500). Dr. Castellani also diagnosed bipolar disorder with a GAF rating of 55. Dr. Castellani also found that the plaintiff was "moderately limited" in ability to understand and remember, to concentrate and persist, to interact socially, and in area of adaptation (Tr. 499). She concluded that it was important for his functioning that the plaintiff comply with his medications (Tr. 500).

## **DECISION OF THE ALJ**

The ALJ made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through September 30, 2008.

2. The claimant has not engaged in substantial gainful activity since January 28, 2003, the alleged onset date.

3. The claimant has the following severe impairments: obesity, depression, bipolar disorder, and alcohol dependence, in early remission.

4. The claimant does not have an impairment that meets or medically equals one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to lift 50 pounds occasionally, 5 pounds frequently, and sit, stand or walk about 6 hours of an 8 hour workday and perform postural activities

9

> frequently. He could complete simple and some detailed tasks and sustain persistence on repetitive, routine activities requiring limited contacts with the public. He would need assistance in setting realistic goals.
>
> 6. The claimant is unable to perform any past relevant work.
>
> 7. The claimant was born on October 5, 1967 and was 35 years old, which is defined as a "younger individual" on the alleged disability onset date.
>
> 8. The claimant has a high school education and is able to communicate in English.
>
> 9. Transferability of job skills is not material to the determination of disability.
>
> 10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.
>
> 11. The claimant has not been under a "disability," as defined in the Social Security Act, from January 28, 2003 through the date of this decision.

(Tr. 14-23).

The Appeals Council denied plaintiff's request for review of the ALJ's decision (Tr. 7-10). Therefore, the ALJ's decision stands as the Commissioner's final decision subject to judicial review pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

10

## STANDARD OF REVIEW

If the ALJ's findings are supported by substantial evidence based upon the record as a whole, they are conclusive and must be affirmed. Warner v. Commissioner of Social Security, 375 F.3d 387 (6th Cir. 2004). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Siterlet v. Secretary of Health and Human Services, 823 F.2d 918, 920 (6th Cir. 1987). It is immaterial whether the record may also possess substantial evidence to support a different conclusion from that reached by the ALJ or whether the reviewing judge may have decided the case differently. Crisp v. Secretary of Health and Human Services, 790 F.2d 450, 453 n.4 (6th Cir. 1986); and see Dorton v. Heckler, 789 F.2d 363, 367 (6th Cir. 1986) (holding that, in a close case, unless the Court is persuaded that the Secretary's findings are "legally insufficient," they should not be disturbed). The Court may not review the case de novo, resolve conflicts in evidence, or decide questions of credibility. Garner v. Heckler, 745 F.2d 383, 387 (6th Cir. 1984).

## ANALYSIS

Plaintiff argues that the ALJ erred in finding that he was not disabled, because the ALJ "improperly rejected and ignored the medical opinions of his treating physician and consultative examinations in making his disability determination" [Doc. 11]. Plaintiff argues that Dr. LeBuffe's July, 2005 Medical Source Statement Of Ability To Do Work-Related Activities (Mental) assessed certain mental limitations which, if given controlling weight by the ALJ, would have resulted in a finding of disability and the award of benefits. The plaintiff also cites to the

11

consultative examinations conducted by Garland and Castellani, arguing that they support a finding of disability.

The Commissioner asserts that substantial evidence supports the ALJ's residual functional capacity finding for medium work. The Commissioner argues that this finding was consistent with the opinions rendered by Dr. Schact, and further, that Dr. LeBuffe's assessment on the severity of plaintiff's mental limitations is exaggerated.

The Court finds that the relative amount of weight given by the ALJ to the opinions of Dr. Schact and Dr. LeBuffe was appropriate. The ALJ may not assign controlling weight to a treating physician's opinion unless the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record. 20 C.F.R. § 404.1527(d)(2); SSR 96-2p; Walters v. Commissioner of Social Security, 127 F.3d 525, 530 (6th Cir. 1997).

The Court agrees with the defendant that the ALJ discussed Dr. LeBuffe's opinion in detail and gave good reasons for rejecting his conclusions. The ALJ noted that in July 2005, Dr. LeBuffe completed a form on which he indicated that plaintiff had marked or extreme limitations in all areas inquired about (Tr. 18). He further noted that the plaintiff, according to Dr. LeBuffe, was unable to take his medications without his girlfriend's assistance and that, due to "worry," he was unable to concentrate well enough to follow through and complete tasks. The ALJ pointed out that, during a December 2005 office visit, Dr. LeBuffe stated that plaintiff was "was doing quite well, better than in a long time" (Tr. 18, referring to Tr. 554). Indeed, Dr. LeBuffe noted that plaintiff indicated at that time that his mood had been stable (Tr. 554). The ALJ observed that this statement

12

was not consistent with the medical assessment from Dr. LeBuffe. In addition, he noted that the record showed that plaintiff was functioning better than the level assessed by Dr. LeBuffe.

The following arguments advanced by the defendant are persuasive. The ALJ noted that Dr. Schact pointed out that the IQ and academic testing in the record was inconsistent with the plaintiff's ability to obtain a commercial driver's license with hazardous material certification and that treating doctors had not viewed him as intellectually impaired (Tr. 18). He noted Dr. Schact's statement that while the plaintiff had various episodic substance-induced or substance-exacerbated crises that resulted in multiple brief hospitalizations, the limitations associated with these incidents were relatively brief and did not meet the duration requirement that a disability be present for a continuous 12-month period. The ALJ also explained that in the May 2006 medical source statement, Dr. Schact indicated that the plaintiff had only slight limitations in his ability to interact appropriately with the public, co-workers, and supervisors and to respond to work pressures (Tr. 19). The ALJ commented that, if Dr. LeBuffe's 2006 notes were accepted, then the plaintiff had marked limitations in these areas (Tr. 19, referring to Tr. 554-55). But, as the ALJ noted, to accept Dr. LeBuffe's conclusions, one had to conclude that the plaintiff's condition deteriorated significantly after he stopped drinking, which Dr. Schact testified was an unusual clinical course, especially where, as here, the deterioration occurred after the plaintiff stopped taking his anti-alcohol medication.

The ALJ explained that the mental residual functional capacity he adopted was based on the testimony and statements of the medical expert and the record as a whole (Tr. 21). As the ALJ stated, his assessment was also supported by the opinion of the reviewing medical consultant, Dr.

13

Kourany, M.D., who reviewed the record and opined in October 2004 that the plaintiff had some moderate limitations, but was able to complete simple and some detailed tasks and sustain persistence on repetitive and routine activities requiring limited contacts with the public; that he would accept supportive criticism from supervisors and co-workers; and that he would need assistance setting realistic goals (Tr. 21; see Tr. 515-17). The ALJ was entitled to rely on these opinions. Under the regulations, agency medical consultants and other program physicians are "highly qualified physicians . . who are also experts in Social Security disability evaluation." 20 C.F.R. § 404.1527(f)(2)(I).

In addition, the ALJ noted that the plaintiff's impairment was present at about the same level prior to his alleged onset date, but that did not prevent him from working (Tr. 21). That, according to the ALJ, strongly suggested that the impairment did not prevent him from working during the relevant period and that his allegations were exaggerated.

The ALJ also pointed out that the inconsistent statements by the plaintiff cast doubt on his credibility (Tr. 21). An ALJ's credibility finding is entitled to significant deference. See Cruse v. Commissioner of Social Security, 502 F.3d 532, 542 (6th Cir. 2007) ("[A]n ALJ's credibility determinations about the claimant are to be given great weight. . .").

The ALJ reasonably relied on the vocational expert's testimony to conclude that plaintiff could perform a significant number of jobs, despite the limitations caused by his impairments.

Accordingly, I find that the ALJ properly reviewed and weighed all of the medical source opinions, the objective medical findings, and plaintiff's credibility to determine that he could

14

perform a range of light work. Substantial evidence in the record as a whole supports the ALJ's findings and conclusions. Therefore, it is hereby **RECOMMENDED**[1] that the plaintiff's Motion For Summary Judgment [Doc. 10] be **DENIED** and that the defendant's Motion For Summary Judgment [Doc. 17] be **GRANTED**.

Respectfully submitted,

s/ H. Bruce Guyton
United States Magistrate Judge

---

[1] Any objections to this Report and Recommendation must be served and filed within ten (10) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 72(b), Federal Rules of Civil Procedure. Failure to file objections within the time specified waives the right to appeal the District Court's order. Thomas v. Arn, 474 U.S. 140, 106 S. Ct. 466 (1985). The district court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive or general. Mira v. Marshall, 806 F.2d 636 (6th Cir. 1986). Only specific objections are reserved for appellate review. Smith v. Detroit Federation of Teachers, 829 F.2d 1370 (6th Cir. 1987).